**Opinion filed June 18, 2026**



In The

# Eleventh Court of Appeals

_____

## No. 11-25-00009-CR

_____

**LAUREN DANIELLE DOVERS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellees**

**On Appeal from the 443rd District Court**

**Ellis County, Texas**

**Trial Court Cause Nos. 49760CR & 47286CR**

## M E M O R A N D U M   O P I N I O N[1]

Appellant, Lauren Danielle Dovers, was charged in two separate indictments with the offenses of capital murder and tampering with a human corpse. TEX. PENAL CODE ANN. §§ 19.03(a)(2); 37.09(c), (d)(1) (West Supp. 2025). These offenses were

---

[1]Pursuant to Misc. Docket Order No. 24-9105 issued by the Texas Supreme Court on December 20, 2024, this appeal was transferred to us from the Tenth Court of Appeals. Therefore, as the transferee court, we must decide the issues raised in this appeal in accordance with the precedent of the Tenth Court of Appeals if its precedent conflicts with ours. *See* TEX. R. APP. P. 41.3.

consolidated for trial, and the jury convicted Appellant of both offenses. For Appellant's capital murder conviction, the State did not seek the death penalty, therefore the trial court sentenced her to life in prison without the possibility of parole. PENAL § 12.31(a)(2) (West 2019). The jury assessed Appellant's punishment for her tampering conviction at imprisonment for twenty years.

In three issues, Appellant contends that the evidence is legally insufficient to support: (1) her conviction for tampering; (2) her conviction for capital murder; and (3) the kidnapping element of capital murder. We affirm.

## I. *Factual Background*

The underlying circumstances of the victim's brutal murder are graphic.

On March 24, 2021, Jordan von Hoffman's body was found in a shed behind a trailer home on Ensign Road in Ellis County, wrapped in a tarp and packed inside a plastic barrel. He had been hogtied and he was naked. He was covered in bruises and wounds, including skull fractures and multiple lacerations, and a ligature mark was around his neck. The shed smelled strongly of gasoline and the yard outside contained the remains of a large fire pit. The barrel holding von Hoffman's body was so heavy that a large man at the scene was unable to move it. The medical examiner determined that von Hoffman's cause of death was "homicidal violence, including blunt force injuries and neck compression."

Von Hoffman and Trenton Adams, a high school classmate and friend, had been renovating the trailer home on the property where von Hoffman's body was discovered. The property was in a remote area of the county with limited cell reception and fewer neighbors. Appellant was Adams's girlfriend and had previously dated von Hoffman in high school. Von Hoffman periodically lived with Adams and Appellant at Appellant's family's home, "rough[ed] it" at the trailer, or stayed at his employer's house during the work week. A neighbor to the Ensign

2

Road property testified that, one night during the weekend of March 20, he saw a man and a woman with long hair feeding things into a large fire near the trailer.

The forensic evidence included numerous bloodstains and purple paint inside the trailer and on von Hoffman's body, the plastic barrels, the tarp, and other items found with the body. One of the bedrooms was covered in purple paint and contained traces of blood spatters on the ceiling. The purple paint showed drag marks from the trailer and to the shed where von Hoffman's body was discovered. Von Hoffman's body was wrapped in a brown tarp and cellophane packaging, as well as several layers of clear plastic wrap and black trash bags. He had been hogtied with a wire and a bungee cord tied to a long board. Five curved lacerations on von Hoffman's head, as well as others elsewhere on his body, appeared to be consistent with the heads of a bloodstained hammer found inside a duffel bag, which was found inside one of the trash bags in the barrel. The medical examiner testified that the injuries were consistent with von Hoffman being tied up and attacked, but she could not be certain of the order in which the injuries occurred.

Pursuant to law enforcement's investigation into von Hoffman's death, Adams was arrested and later convicted of capital murder for his participation in kidnapping and murdering von Hoffman. *See Adams v. State*, No. 10-24-00041-CR, 2025 WL 1766138, at *1 (Tex. App.—Waco June 26, 2025, no pet.) (mem. op., not designated for publication) (affirming Adams's conviction for capital murder).

The investigation also showed that Appellant: (1) knowingly participated in the scheme to lure von Hoffman to the trailer where he was murdered; (2) purchased key items used in von Hoffman's murder and the concealment of his body; (3) made several incriminating admissions; and (4) fled with Adams and never asked for help or attempted to separate from him, despite opportunities to do so.

A. *Appellant Participated in the Scheme to Lure von Hoffman to the Trailer*

In the week leading up to von Hoffman's murder, he drove a pickup belonging to Adams. On Friday, March 19, Adams continuously contacted von Hoffman throughout the day, asking von Hoffman to return the pickup for various reasons. Adams refused to retrieve the pickup himself and insisted that von Hoffman deliver it to him.

On the same day, Adams messaged Sydni Shaffer, an acquaintance with whom he was reconnecting, over Facebook messenger using Appellant's account— Shaffer knew it was Adams by his speech pattern and the conversation, and she found it unusual to use someone else's Facebook account. In that conversation, Adams implied that Appellant had cheated on him with his "h[ome]b[oy]," his "best friend."

In the afternoon, a message was sent from Appellant's Facebook account to von Hoffman, inviting him to stay the night with her at her father's house where she lived. She told von Hoffman that Adams would be gone. Later that night, she asked von Hoffman if he knew where she could obtain drugs because Adams had not left her any and he was in Houston. At 10:55 p.m.,[2] Adams messaged von Hoffman that he had gone to Austin for the weekend to see "Sydni," and that von Hoffman should return the pickup to Appellant.

At around 6:30 a.m. on Saturday, March 20, Adams messaged Shaffer through his own Facebook account and asked her to send a message to von Hoffman, asking

---

[2]Many of the time stamps and dates in the Facebook messages are shown in 24-hour UTC (Coordinated Universal Time). Testimony attempts to convert those time stamps to CST (Central Standard Time), but the events at issue—beginning March 19, 2021—occurred during daylight saving time, when the applicable local time was CDT (Central Daylight Time), i.e. UTC-5 rather than UTC-6. *See* 15 U.S.C. § 260a(a) (daylight saving time begins on the second Sunday of March each year and ends on the first Sunday of November). The distinction between UTC and local time explains apparent inconsistencies in the timing of the messages: for example, although the Facebook message records show that Adams messaged von Hoffman on March 20 at 3:55:27 UTC and again at 13:14:23 UTC, conversion to CDT places the first call at 10:55 p.m. on March 19, and the second call at 8:14 a.m. on March 20.

him to return the pickup to the trailer on Ensign Road. Adams specifically explained his intent to lure von Hoffman to the trailer: he told Shaffer that he wanted to "snatch this n---a up lol he did something no bueno" and that von Hoffman "touched someone[']s stuff he shouldn[']t have but [Adams is] trying to not let him get a heads up and make him think [he's] with [Shaffer] so his scary a-s will actually pullup. . . . Plus he[']s driving one of [Adams's] vehicles so [he didn't] wanna spook him yet." Shaffer messaged von Hoffman but, as she informed Adams, the message did not transmit because she was not Facebook friends with von Hoffman.

Adams messaged and called von Hoffman several times on March 20, beginning in the morning and ending at around 4:45 p.m. At around 4:30 p.m., Adams asked Shaffer to message von Hoffman again on his behalf with the same request and to ask von Hoffman to bring Appellant some marihuana. Adams stated to Shaffer he was "[t]rying to juke him still." Shaffer sent the message but again it did not transmit.

Taylor Shiflet, von Hoffman's employer, and Russell Shaid worked with von Hoffman all day on March 20. Shaid observed von Hoffman receive and send multiple texts while driving to and from Lowe's for materials; von Hoffman's demeanor became serious, and he told Shaid that he needed to return the pickup immediately. At around 7:00 or 7:30 p.m., Shiflet overheard von Hoffman receive a call and recognized that the caller was female. He testified that the caller was Appellant. She asked von Hoffman to deliver the pickup to her that night at the Ensign Road property and to pick up some marihuana for her, and she said she would bring von Hoffman back to Shiflet's later that evening. Von Hoffman left Shiflet's about twenty minutes later and said he would return later that evening. He never returned.

At 4:05 a.m. on Sunday, March 21, a message was sent from von Hoffman's Facebook account, which stated that she "enjoyed [their] time" and that "[a]s sad as

it [was] cheating on [her] boyfriend with his best friend, the least [they] could do for him would be to keep it respectful." Minutes later, a second message from von Hoffman's account stated: "Good night, best friend."

B. *Appellant Purchased Key Items Used in Both Crimes*

Receipts and store surveillance video show Adams and Appellant shopping at a Home Depot in Waxahachie at 7:15 p.m. on March 19, contrary to their assertions to von Hoffman that same day that Adams was out of town. While at Home Depot and Walmart, they purchased several items that were found later at the crime scene, including (1) the large blue plastic barrels or trash bins in which von Hoffman's body was discovered, (2) the tarp in which his body was wrapped, (3) two pairs of gloves—one pair stained with von Hoffman's blood—and (4) purple paint found all over the crime scene and on von Hoffman's body. Appellant paid for all the items. The video footage shows Appellant and Adams shopping together on March 19, when she purchased the plastic barrels.

The State presented evidence that Appellant may have purchased the brown tarp, which was discovered wrapped around von Hoffman's body, on March 21, the day *after* von Hoffman left Shiflet's to meet her and disappeared. The Walmart security video footage shows a woman alone, wearing a mask and a short ponytail, who purchased a tarp that matches the one found at the crime scene. The Walmart asset protection employee testified that he could not tell if the woman in the Walmart video footage was the same woman shown in the Home Depot video footage, who did not wear a mask and who was accompanied by Adams. Sergeant McIntosh, the lead investigator in the case for the Ellis County Sheriff's Department, testified that the woman in the Walmart video footage on March 21 appeared to be Appellant.

C. *Appellant Made Numerous Incriminating Admissions*

Adams's DNA and fingerprints were recovered from various crime scene items, including the tarp. Appellant's DNA and fingerprints were not found on any

items at the crime scene. But in an e-mail recovered from her google account, written in November 2021, Appellant admitted that she was present at the murder: "I will make this short and spare you the details of that night, but that night he told me you're lucky this isn't you."[3] She also admitted that Adams told her of the plan to kidnap and murder von Hoffman beforehand: "[I] was going to help him kill someone. . . . He wasn't kidding." Appellant wrote that she knew of Adams's plan for several days leading up to the murder, and that she participated in the plan: "Things got more and more real every day and [I] knew this was really happening when he made me keep his gun in my purse and told me we are going to [H]ome [D]epot. I wasn't able to be alone."

D. *Appellant Fled with Adams*

At times in her e-mail, Appellant attempted to frame herself as being under Adams's influence and unable to escape him. For example, she wrote: "The last night leading up to the murder . . . [h]e kept yelling at me, using my phone to try to set people up as me." She wrote that she was "a missing person and a suspect and had NO idea because [her] life was no longer [her] own."

Adams and Appellant arrived at Shaffer's home in San Marcos on Monday, March 22, after messaging her the day before. Appellant's three-year-old daughter was with them. In her e-mail, Appellant wrote that Adams "made [her] take [her] daughter with [them] and [they] were on the run for 3 days . . . [t]he gun stayed in [her] purse the whole time." Shaffer booked a hotel room for them and helped them buy food, out of concern for the child. Shaffer testified that Adams and Appellant seemed like "a unit" and acted like a couple in her eyes. On March 24, they checked out of the hotel and returned briefly to Shaffer's home, where Zackery Widner, the

---

[3]In the same e-mail, describing a later violent outburst by Adams, she also wrote: "Was [I] about to see my second murder?"

father of Appellant's daughter, picked up the child. Adams left before Widner arrived and returned after he left; during his absence Appellant did not ask Shaffer for help, state that she was afraid of Adams, or request to use a phone to call for help, although she had called Widner to pick up their daughter.

Widner testified that he was scheduled to have the child during the weekend of the murder, but *Adams* asked him to keep the child that Thursday, March 18, prior to his scheduled weekend, rather than dropping her off with Appellant as scheduled; later, Appellant called him crying to countermand that request and to instruct Widner to bring the child to her. Widner testified that, in accordance with their usual schedule, Appellant had the child from Sunday, March 21 to Wednesday, March 24. After von Hoffman was reported missing and Appellant was named as a person of interest, Appellant contacted Widner and asked him to pick up their child from Shaffer's home in San Marcos. Widner noted that Appellant used a different phone number than her customary one. Widner arrived at Shaffer's with his fiancée and a friend, and offered to help Appellant leave with them, but she declined. Widner, who had seen Appellant under the influence in the past, believed that Appellant appeared to be under the influence of methamphetamine. Adams was not there; Shaffer testified that he had left before Widner arrived and returned later. Appellant did not ask Widner for help or state that she had been threatened by Adams or that she was in danger.

Widner also testified that when he dated Appellant—as recently as 2019—she had stated she "wanted to know what it felt like to end someone's life." At the time, he did not think that she meant anything by it and did not perceive her to be a danger to others.

## II. *Standard of Review*

We review a challenge to the sufficiency of the evidence, regardless of whether it is framed as a legal or factual sufficiency challenge, under the standard of

review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Garcia v. State*, 667 S.W.3d 756, 761 (Tex. Crim. App. 2023); *Zuniga v. State*, 551 S.W.3d 729, 732 (Tex. Crim. App. 2018); *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

Viewing the evidence in the light most favorable to the verdict requires that we consider all the evidence admitted at trial, including improperly admitted evidence. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *Lee v. State*, 676 S.W.3d 912, 915 (Tex. App.—Eastland 2023, no pet.). We defer to the factfinder's credibility and weight determinations because the factfinder is the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *See* TEX. CODE CRIM. PROC. ANN. art. 36.13 (West 2007); *Garcia*, 667 S.W.3d at 762; *Winfrey*, 393 S.W.3d at 768; *Brooks*, 323 S.W.3d at 899; *Clayton*, 235 S.W.3d at 778. This deference accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Garcia*, 667 S.W.3d at 761; *Zuniga*, 551 S.W.3d at 732; *Clayton*, 235 S.W.3d at 778. We may not reevaluate the weight and credibility of the evidence to substitute our judgment for that of the factfinder. *Garcia*, 667 S.W.3d at 762; *Winfrey*, 93 S.W.3d at 768; *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). Therefore, if the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Garcia*, 667 S.W.3d at 762;

*Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012); *Clayton*, 235 S.W.3d at 778.

Because the standard of review is the same, we treat direct and circumstantial evidence equally. *Isassi*, 330 S.W.3d at 638; *Clayton*, 235 S.W.3d at 778; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *Ruiz v. State*, 631 S.W.3d 841, 851 (Tex. App.—Eastland 2021, pet. ref'd). It is not necessary that the evidence directly prove the defendant's guilt. Rather, circumstantial evidence is as probative as direct evidence in establishing the guilt of the defendant and can, without more, be sufficient to establish his guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper*, 214 S.W.3d at 13); *Lee*, 676 S.W.3d at 915. A guilty verdict does not require that every fact must directly and independently prove a defendant's guilt if the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Hooper*, 214 S.W.3d at 13. Therefore, in evaluating the sufficiency of the evidence, we must consider the cumulative force of all the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017); *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015).

Finally, we measure the sufficiency of the evidence by the elements of the charged offense as defined by the hypothetically correct charge for the case. *Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016); *see also Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). In this regard, to determine whether the State has met its burden to prove a defendant's guilt beyond a reasonable doubt under the *Jackson* standard, we compare the elements of the offense to the evidence adduced at trial. *Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014) (citing *Malik*, 953 S.W.2d at 240). The hypothetically correct charge "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and

adequately describes the particular offense for which the defendant was tried." *Malik*, 953 S.W.2d at 240.

### III. *Governing Law*

A person commits the offense of tampering with a human corpse if, "knowing that an offense has been committed, [the person] alters, destroys, or conceals [a human corpse] . . . with intent to impair its . . . availability as evidence in any subsequent investigation of or official proceedings related to the offense." PENAL § 37.09(c), (d)(1). This statute requires proof of three elements: the defendant (1) knew an offense was committed; (2) concealed, altered, or destroyed a thing, here, a human corpse; and (3) intended to impair the availability of the corpse as evidence in any subsequent investigation or official proceeding that is related to the offense. *Barron v. State*, 629 S.W.3d 557, 563 (Tex. App.—Eastland 2021, pet. ref'd) (citing *Stahmann v. State*, 602 S.W.3d 573, 576 (Tex. Crim. App. 2020)).

Proof of actual concealment "requires a showing that the allegedly concealed item was hidden, removed from sight or notice, or kept from discovery or observation." *Stahmann*, 602 S.W.3d at 581; *see also Rotenberry v. State*, 245 S.W.3d 583, 586 (Tex. App.—Fort Worth 2007, pet. ref'd) (noting in dicta that "[the defendant] concealed *physical evidence*—[the victim's] body—when [the defendant] hid the body in the septic tank"). A person acts with the intent to impair the availability of the evidence in a subsequent investigation or proceeding that is related to the offense when it is the person's conscious objective or desire to impair the availability of the evidence. PENAL § 6.03(a) (West 2021). The focus of this element is only whether the defendant *intended* to impair the availability of the evidence by concealing it; it is not an element of the offense that concealment actually impair the evidence's availability. *Barron*, 629 S.W.3d at 563 (citing PENAL § 37.09(d)(1)); *Carnley v. State*, 366 S.W.3d 830, 835 (Tex. App.—Fort Worth 2012, pet. ref'd).

As relevant to this case, a person commits capital murder if the person commits the offense of murder as defined in Section 19.02(b)(1) and does so intentionally while in the course of committing or attempting to commit kidnapping. *See* PENAL §§ 19.02(b)(1), 19.03(a)(2). A person commits kidnapping if she intentionally or knowingly abducts another person. PENAL § 20.03 (West 2026). "Abduct" means to restrain a person with intent to prevent his liberation by secreting or holding him in a place where he is not likely to be found or using or threatening to use deadly force. PENAL § 20.01(2). "Restrain" means "to restrict a person's movements without consent, so as to interfere substantially with the person's liberty, by moving the person from one place to another or by confining the person." PENAL § 20.01(1). "Restraint is 'without consent' if it is accomplished by force, intimidation, or deception." PENAL § 20.01(1)(A).

A person commits criminal attempt if, "with specific intent to commit an offense, [s]he does an act amounting to more than mere preparation that tends but fails to effect the commission of the offense intended." *Parker v. State*, 727 S.W.3d 38, 51 (Tex. Crim. App. 2025) (quoting PENAL § 15.01). The Court of Criminal Appeals has "construed the attempt statute to draw an 'imaginary line' that separates an act that amounts to no more than 'mere preparation' from an act that tends but fails to effect the commission of the offense." *Id.* (quoting *Swenson v. State*, 707 S.W.3d 297, 302 (Tex. Crim. App. 2024)).

A person is criminally responsible as a party to an offense if the offense is committed by her own conduct, by the conduct of another for which she is criminally responsible, or both. PENAL § 7.01(a). A person is criminally responsible for an offense committed by the conduct of another if, acting with the intent to promote or assist in the commission of the offense, she solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. PENAL § 7.02(a)(2). "Mere presence at the scene of a crime, or even flight from the scene, without more, is

12

insufficient to support a conviction as a party to the offense." *Rodriguez v. State*, 521 S.W.3d 822, 828 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (citing *Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012)). "However, flight from the scene together with additional evidence showing a mutual understanding and common design to commit the offense may be sufficient to support a guilty verdict." *Padilla v. State*, 698 S.W.3d 589, 595 (Tex. App.—Houston [14th Dist.] 2024, pet. ref'd) (citing *Gross*, 380 S.W.3d at 186).

To establish a defendant's liability as a party, the State must prove that, in addition to the primary actor's illegal conduct, the defendant, "harbored the specific intent to promote or assist [in] the commission of the offense." *Rodriguez*, 521 S.W.3d at 828 (quoting *Barnes v. State*, 62 S.W.3d 288, 296 (Tex. App.—Austin 2001, pet. ref'd)). For criminal liability to attach, the defendant must know that she was assisting in the commission of the offense. *Id.* In determining whether a defendant is a party to an offense, we may consider events that occur before, during, and after the commission of the offense. *Gross*, 380 S.W.3d at 186.

IV. *Analysis*

A. *The Tampering Conviction*

In her first issue, Appellant contends that the evidence is insufficient to support her conviction for tampering by concealing von Hoffman's body because none of the fingerprint, DNA, and other crime scene evidence indicated that she participated in the offense, and the evidence that she purchased items that may have been used in the crimes did not show her intent to conceal von Hoffman's body.

Appellant admitted that she knew of Adams's plan to lure and murder von Hoffman for days beforehand. She admitted that she "knew this was really happening" when they went to Home Depot, which indicated her knowledge that the items purchased at Home Depot were in furtherance of that plan. *See Rodriguez*, 521 S.W.3d at 828. Significantly, the plastic barrels used to hide von Hoffman's

13

body were purchased by Appellant at Home Depot. Appellant also paid for all the items, many of which were found at the crime scene and hidden with von Hoffman's body.

The jury could have logically inferred from the evidence that Appellant helped hide von Hoffman's body. Appellant purchased the barrels in which the body was hidden, and she admitted that she knew about the plan to murder von Hoffman before she purchased them. *See Rodriguez*, 521 S.W.3d at 828; *Rotenberry*, 245 S.W.3d at 586. A neighbor testified that on the weekend of the murder, he saw a woman and a man burning things in front of the trailer where von Hoffman was killed. The shed where the body was found had a strong odor of gasoline and the yard outside the shed contained the remains of a large fire pit. The barrel that held von Hoffman's body was so heavy that a large man at the scene was unable to move it. Appellant also admitted that she was present when von Hoffman was murdered. And, although neither her DNA nor her fingerprints were found at the crime scene or detected by forensic evidence, two pairs of gloves were recovered from the crime scene, indicating the possibility of her participation without DNA detection.

The jury is the sole judge of the weight and credibility of the evidence. *See Garcia*, 667 S.W.3d at 762; *Brooks*, 323 S.W.3d at 899; *Dewberry*, 4 S.W.3d at 740. Here, the jury could have logically inferred from the evidence that Appellant helped conceal von Hoffman's body to cover up his murder. *See Garcia*, 667 S.W.3d at 762 ("If the record supports conflicting inferences, the reviewing court must 'presume that the factfinder resolved the conflicts in favor of the prosecution' and defer to the jury's factual determinations." (quoting *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012))).

We have reviewed the evidence in the light most favorable to the verdict, and we conclude that a rational jury could have logically inferred and found beyond a reasonable doubt the essential elements of the offense of tampering with a human

14

corpse as charged in the indictment. *Jackson*, 443 U.S. at 319; *Garcia*, 667 S.W.3d at 761; *see also* PENAL § 37.09(c), (d)(1). Accordingly, we overrule Appellant's first issue.

B. *The Capital Murder Conviction*

In her second and third issues, Appellant contends that there is no evidence that she committed capital murder or participated as a party to this offense. Specifically, she contests the sufficiency of the evidence to support the elements of (1) murder, and (2) the aggravating factor, kidnapping or attempted kidnapping. PENAL §§ 19.02(b)(1), 19.03(a)(2); *Parker*, 727 S.W.3d at 50–51.

Although Appellant attempted to portray herself as being under Adams's control and unable to escape his influence, the evidence shows that she: (1) knowingly participated in the scheme to lure von Hoffman to the trailer where he was murdered; (2) purchased key items used in von Hoffman's murder and the concealment of his body; (3) made several incriminating admissions; and (4) fled with Adams and never asked for help or attempted to separate from him, despite many opportunities to do so.

Appellant acted independently in furtherance of the murderous scheme on multiple occasions, refused offers of assistance from Shaffer and Widner, and never asked for help or tried to leave when she was not with Adams. *See Chavez v. State*, 666 S.W.3d 772, 778 (Tex. Crim. App. 2023) ("Evidence that an accomplice or accomplices performed certain acts pertinent to the alleged crime does not show that [a]ppellant did not have the intent to kill."). For example, Shiflet testified that Appellant called von Hoffman just before he left and disappeared on March 20, and she asked him to bring Adams's pickup to her. As discussed, Appellant admitted she knew of the plan beforehand and participated in its preparation and execution. She bought items she knew were to be used in von Hoffman's murder. The State also presented evidence that Appellant purchased the tarp that was found wrapped

around von Hoffman's body the day after he disappeared, and that she made this purchase alone, without Adams accompanying her. *See id.*

Further, Appellant claimed that Adams forced her to take her young daughter with them when they fled after the murder, but Widner testified that Appellant insisted on having possession of her daughter, which was in accordance with their usual schedule of shared custody. *See Clay v. State*, 240 S.W.3d 895, 905 n.11 (Tex. Crim. App. 2007) ("Evidence of flight evinces a consciousness of guilt." (citing *Fentis v. State*, 582 S.W.2d 779, 780–81 (Tex. Crim. App. 1976))). Widner also testified that Appellant may have purchased another phone because she had changed her phone number.

When Widner arrived at Shaffer's to take their daughter, he invited Appellant to leave with them, but she declined. To Widner, Appellant appeared to be under the influence of methamphetamine. Adams was not there at the time, and Shaffer testified that he left before Widner arrived and returned later. Appellant never asked Widner for assistance or stated that she had been threatened by Adams or was in any danger. Shaffer also testified that Adams and Appellant seemed like "a unit" and acted like a couple. *See Padilla*, 698 S.W.3d at 595 (flight with additional evidence showing a mutual understanding and common design). And Widner testified that in the past Appellant had expressed a desire "to know what it felt like to end someone's life."

Appellant contends there is no evidence of a kidnapping or attempted kidnapping because the medical examiner could not determine whether von Hoffman was killed before or after he was hogtied, *Herrin v. State*, 125 S.W.3d 436, 440 (Tex. Crim. App. 2002), and because there is no evidence that she participated in any kidnapping. *Herrin* is inapposite. In that case, it was undisputed that the deadly shooting was followed by the defendant moving the deceased's body. *See id.* at 440. Here, the State presented evidence from which the jury could have

16

reasonably inferred that Adams's and Appellant's intent to kidnap von Hoffman was formed before he was murdered. *Cunningham v. State*, 590 S.W.3d 624, 632–33 (Tex. App.—Houston [1st Dist.] 2019, no pet.). Moreover, the medical examiner's inability to rule out the possibility that von Hoffman was tied up and packed into a barrel after he was murdered does not preclude the jury's authority to infer from the cumulative force of all the circumstantial evidence that von Hoffman was murdered during the course of being kidnapped. *See, e.g.*, *Swearingen v. State*, 101 S.W.3d 89, 96–97 (Tex. Crim. App. 2003) (holding that each piece of evidence supporting the jury findings of kidnapping might be weak individually, but cumulatively gained strength together, and the experts' inability to rule out possibilities from the physical evidence did not preclude jury findings); *see also Villa*, 514 S.W.3d at 232; *Murray*, 457 S.W.3d at 448.

The evidence shows that Appellant helped to deceive and lure von Hoffman to a remote location—the trailer on Ensign Road—to murder him. *See Robinson v. State*, 568 S.W.3d 718, 723 (Tex. App.—Amarillo 2019, no pet.) (A victim who voluntarily joins a perpetrator does not thereby consent to restraint; once deceptive means are used to limit the victim's liberty and substantially interfere with it, the restraint element is satisfied.); *see also King v. State*, 29 S.W.3d 556, 563–64 (Tex. Crim. App. 2000) ("[W]hether [the victim] voluntarily accepted a ride with appellant . . . earlier that night is irrelevant."). While Appellant and Adams were creating their deceptive scheme to lure von Hoffman by requesting that he bring Adams's pickup to Appellant, Adams stated to Shaffer the concern that von Hoffman might not "actually pullup" unless they deceived him. *See Robinson*, 568 S.W.3d at 723; *King*, 29 S.W.3d at 563–64.

The remoteness of the property is particularly probative because it simultaneously shows Appellant's intent to secret von Hoffman in a place where he was not likely to be found as well as the manner of restraining him—by luring him

there through deception and confining him in the trailer. PENAL § 20.01(2)(A); *Laster v. State*, 275 S.W.3d 512, 521 (Tex. Crim. App. 2009) ("The offense of kidnapping is legally completed when the defendant, at any time during the restraint, forms the intent to prevent liberation by secreting or holding another in a place [where the person is] unlikely to be found."); *see West v. State*, 406 S.W.3d 748, 759 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) ("Keeping a victim 'isolated from anyone who might have been of assistance meets the element of secreting or holding [the victim] in a place where the victim is not likely to be found.'" (quoting *Megas v. State*, 68 S.W.3d 234, 240–41 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd))).

The evidence shows that von Hoffman was bound and that he had a ligature mark around his neck. The evidence also supports the inference that he was confined in the bedroom of the trailer, which was covered in ubiquitous purple paint and blood stains. Confinement to a bedroom is restraint within the meaning of kidnapping. *See Robinson*, 568 S.W.3d at 722–23 ("To confine means 'to shut up, imprison, immure, put or keep in detention, to relegate to certain limits.'"); *see also Santellan v. State*, 939 S.W.2d 155, 163 (Tex. Crim. App. 1997) (There is no minimum time or distance requirement for the restraint to be established.). Here, the trailer property, trailer bedroom, and the shed were all places where von Hoffman was unlikely to be found. *See Laster*, 275 S.W.3d at 521.

As we have said, the jury is the sole judge of the weight and credibility of the evidence. *See Garcia*, 667 S.W.3d at 762; *Brooks*, 323 S.W.3d at 899; *Dewberry*, 4 S.W.3d at 740. It could have chosen to believe Appellant's characterizations of Adams's control over her and given more weight to the lack of DNA or fingerprint evidence that connected Appellant to the scene of the crime, or it could have chosen to give more weight to the evidence of her voluntary participation in luring and murdering von Hoffman, including her own admissions. *See Garcia*, 667 S.W.3d at

762.  As shown by its verdict, the jury gave more weight to the latter option, and we defer to its determinations.  *See id.*  The same is true for the evidence of kidnapping. A reasonable juror could have logically determined that Appellant intentionally encouraged and assisted Adams in luring, kidnapping, and ultimately murdering von Hoffman.  PENAL § 7.02(a)(2); *see Padilla*, 698 S.W.3d at 595.

We have reviewed the evidence in the light most favorable to the verdict, and we conclude that a rational jury could have logically inferred and found beyond a reasonable doubt the essential elements of capital murder as charged in the indictment.  *Jackson*, 443 U.S. at 319; *Garcia*, 667 S.W.3d at 761; *see also* PENAL § 19.03(a)(2).  Accordingly, we overrule Appellant's second and third issues.

## V.  *This Court's Ruling*

We affirm the judgments of the trial court.


W. STACY TROTTER

JUSTICE


June 18, 2026

Do not publish.  *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.